**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **THOMAS L. WILSON,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | )   **Case. No. 23-3030-EFM-TJJ** |
| | ) |
| **ROBERT K. WALLACE,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS,**
**OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT**

Defendants Robert K. Wallace and Chad D. Clemons ("Defendants"), submit this

memorandum, through Assistant Attorney General Matthew L. Shoger, in support of their

motion under Fed. R. Civ. P. 12(b)(1) and (b)(6) or Fed. R. Civ. P. 56. Defendants respectfully

request that this motion be granted and this action be dismissed or, in the alternative, summary

judgment be granted in their favor. Defendants attach seven new exhibits, outlined in the table

below, and state the following in support.

**INDEX OF EXHIBITS**

| Exhibit | Description |
|---|---|
| A | KASPER Information Sheet |
| B | Declaration of Jennell Buchanan |
| C | KDOC IMPP 10-122D (regarding access to medical care) *effective date: October 15, 2015* |
| D | KDOC IMPP 20-104 and 20-104A (regarding restrictive housing placements) *all versions since: July 21, 2004* |
| E | **(Sealed)** Declaration of Sarah Madgwick |
| F | **(Sealed)** Declaration of Kelly Knipp |
| G | **(Sealed)** KDOC IMPP 12-111A (regarding use of force) |

**NATURE OF THE CASE**

Plaintiff Thomas L. Wilson, an inmate currently incarcerated in restrictive housing at El

Dorado Correctional Facility (EDCF) (Doc. 1 at 1; Exhibit A at 2-3; Exhibit B at ¶ 8), alleges that on February 6, 2022, he had multiple seizures in his cell while prison and medical staff responding to the situation, including Defendant Clemons and nurse Daci Preedin-Caine, did not enter his cell but observed from the other side of his door. (Doc. 1 at 2-3; Exhibit E at ¶¶ 4, 8.) Wilson alleges that he lay choking in his own urine, vomit, and blood. (Doc. 1-1 at 3, 5.) Defendant Clemons radioed for permission to conduct a forced cell entry, but this was denied by Defendant Wallace because Wilson had a past history of weapons possession. (Doc. 1 at 2-3; Doc. 1-1 at 5, 9; Exhibit E at ¶ 6.) Wilson speculates that Defendant Wallace may have actually refused him immediate medical treatment out of retaliation for a past PREA complaint that Wilson filed against Wallace in 2019 or 2020. (Doc. 1-1 at 20-21.) Wilson admits that he had possessed contraband weapons but blames another inmate for it. (Doc. 1-1 at 5.) Wilson says the seizures harmed his back, ribs, and head, causing him to spit up blood. (Doc. 1-1 at 6.) Staff did not conduct a forced cell entry to provide him with medical treatment, as Wilson insists they should have. (Doc. 1 at 2-3; Doc. 1-1 at 3-6, 9). Eventually, Wilson came to the cell door, was restrained, and nurse Preedin-Caine medically assessed him. (Doc. 1-1 at 11; Exhibit E at ¶¶ 9-12.)

Wilson filed this lawsuit on February 6, 2023. (Doc. 1.) For failing to conduct a forced cell entry, Wilson brings a state law claim for negligence against Defendant Wallace and a claim presumably under 42 U.S.C. § 1983 and the Eighth Amendment for "cruel and unusual punishment" apparently against both Defendants. (Doc. 1 at 3; *see also* Ct.'s Mem. & Order, Doc. 6 at 3-4.) He seeks $2 million dollars in punitive damages for pain and suffering due to ongoing back pain allegedly caused by prison staff not providing immediate medical treatment. (Doc. 1 at 5, 3.)

Wilson was placed in restrictive housing on "Other Security Risk" status for the safety and security of the facility because of his possession of two improvised stabbing devices and due to his recent disciplinary reports and "his overall mal-adapted behavior." (Exhibit B at ¶¶ 6-8, pg. 4; see also Exhibit A at ¶¶ 5-10 (disciplinary reports).) Prior to the seizure events taking place, Wilson had recently been angry with officers in the cell house and became argumentative. (Exhibit E at 4.) Medical documentation from the seizure events says that nurse Preedin-Caine medically observed from outside Wilson's cell door that Wilson was breathing normally: his respirations appeared even and unlabored at a rate of 18 breaths per minute. (*See* Exhibit E at ¶¶ 4, 8.) She observed Wilson moving his shoulders and neck. (Exhibit E at 5.) No observations of choking were noted. (*See* Exhibit E.) Wilson's medical record shows that his back pain had been present for at least several months and that his rib pain stemmed from a fight he had been in a month earlier. (Exhibit F at ¶¶ 2, 4-5.) Wilson's medical record does not connect his back pain or rib pain with the seizures on February 6, 2022. (*See* Exhibit F.) A chest x-ray was performed two days after the seizure incidents, which appeared normal, showed no rib fractures, and showed his lungs to be clear. (Exhibit E at ¶ 13, pgs. 7-10.)

The Defendants are entitled to dismissal of Wilson's claims against them in their official capacities for lack of subject-matter jurisdiction due to Eleventh Amendment immunity. The Defendants are entitled to dismissal of the individual capacity claims for failure to state a claim due to lack of a retaliatory motive (for any First Amendment retaliation claims) and due to qualified immunity. Alternatively, the Defendants are entitled to summary judgment on Wilson's claims due to the evidentiary record further supporting qualified immunity. Even if the Court does not grant summary judgment, the Defendants are entitled to dismissal or partial summary judgment on Wilson's claims for punitive damages due to lack of the requisite subjective intent.

If Wilson's § 1983 claims are dismissed or the Court grants summary judgment to Defendants on those claims, then the Court should decline to exercise supplemental jurisdiction over the remaining state law negligence claims.

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## NO GENUINE ISSUE EXISTS

1. Plaintiff Thomas L. Wilson is an inmate currently incarcerated in restrictive housing at El Dorado Correctional Facility (EDCF) (Exhibit A at 2-3; Exhibit B at ¶ 8).

2. Wilson's cellmate made two sick calls between 3:40 A.M. and 5:19 A.M. the morning of February 6, 2022, due to Wilson exhibiting seizure-like activity. (Exhibit E at 4-6.)

3. KDOC staff reported to nurse Daci Preedin-Caine that prior to the seizure events taking place, Wilson had recently been angry with officers in the cell house and became argumentative. (Exhibit E at 4.)

4. Staff responding to the sick calls, including Defendant Officer Clemons and nurse Preedin-Caine, did not enter Wilson's cell until after the second seizure had ended but observed him from the other side of his cell door. (Exhibit E at ¶¶ 4, 8, pg. 5.)

5. Defendant Clemons radioed for permission to conduct a forced cell entry, but this was denied by Defendant Wallace because Wilson had a past history of weapons possession. (Doc. 1-1 at 9; Exhibit E at ¶ 6, pg. 5.)

6. Wilson admits that he had possessed contraband weapons – specifically, two improvised stabbing devices – and he blames another inmate for making him do it. (Doc. 1-1 at 5.)

7. Wilson was placed in restrictive housing on "Other Security Risk" status for the safety and security of the facility because of his possession of those two improvised stabbing devices and due to his recent disciplinary reports and "his overall mal-adapted behavior." (Exhibit B at ¶¶ 6-8, pg. 4; *see also* Exhibit A at ¶¶ 5-10 (disciplinary reports); Exhibit D

at 4, 10-11, 16-17 (policy explaining "Other Security Risk"); Exhibit B at ¶¶ 4-5 (practice).)

8.  The Unit Team Manager at EDCF, Jennell Buchanan, attests that forced cell entry is not generally authorized to facilitate treatment of medical issues. (Exhibit B at ¶ 9.)

9.  Buchanan attests that forced cell entry by its very nature involves the use of force toward inmates and involves a risk of harm and even a risk of death of facility staff. (Exhibit B at ¶¶ 10-11.)

10. Buchanan states that forced cell entry is only authorized when, in the opinion of the appropriate facility staff, in light of the use of force policy outlined in KDOC's Internal Management Policy & Procedure (IMPP) 12-111A and the context of the situation, the justification is sufficient to justify the use of force against inmates and to outweigh the risk to facility staff. (Exhibit B at ¶ 12.)

11. Buchanan attests that an inmate's past history of weapons possession increases the risk of harm to facility staff. (Exhibit B at ¶ 13.)

12. Buchanan attests that no saved surveillance video exists for the medical sick calls to Wilson's cell on February 6, 2022 (or for the general timeframe and location of those incidents).

13. KDOC has a written policy regarding the circumstances in which a physical use of force may be used, Internal Management Policy & Procedure 12-111A, which is marked "staff-read-only." (Exhibit G at 1, 7 (policy); *see also* Exhibit B at ¶ 4 (practice).)

14. Nothing in KDOC's IMPP 10-122D titled "Access to and Availability of Health Care Services" requires forced cell entry, even the sections on Restrictive Housing (Exhibit C at 5-6 (policy)) and Emergency Care Services (Exhibit C at 8-9 (policy)). *See also*

Exhibit B at ¶ 4 (practice).

15. Medical documentation from the event says that nurse Preedin-Caine medically observed from outside Wilson's cell door that Wilson was breathing normally: his respirations appeared even and unlabored at a rate of 18 breaths per minute. (*See* Exhibit E at ¶¶ 4, 8, pg. 5.)

16. Nurse Preedin-Caine observed Wilson moving his shoulders and neck. (Exhibit E at 5.)

17. She did not document any observations of choking. (*See* Exhibit E at 1-6.)

18. She did not document any worsening symptoms or developing complications. (*See* Exhibit E at 1-6.)

19. She did not document any blood, vomit, or urine. (*See* Exhibit E at 1-6.)

20. Nurse Preedin-Caine left in between the seizures, but before Preedin-Caine left Wilson was advised that a sick call would be placed for him for follow up since he could not be further assessed at that time. (Exhibit E at ¶ 7, pg. 5.)

21. When the second seizure occurred, nurse Preedin-Caine returned. (Exhibit E at ¶ 8, pg. 5.)

22. After nurse Preedin-Caine arrived for the second sick call, she did not leave. She medically observed Wilson until he received medical treatment. (Exhibit E at ¶ 8-12, pgs. 5-6.)

23. Eventually, Wilson came to the cell door, was restrained, and nurse Preedin-Caine medically assessed him. (Doc. 1-1 at 11; Exhibit E at ¶¶ 9-12, pgs. 5-6.)

24. She documented how Wilson made his way to the door, saying he "rises slowly and comes to the food pass with his hands behind his back." (Exhibit E at 5; *see also id.* at ¶ 9.)

25. Nurse Preedin-Caine assessed Wilson in his cell and documented that he was alert and oriented. (Exhibit E at ¶ 10, pg. 5.)

26. She further documented that his pupils were equal, round, and reactive to light and that his vital signs were within normal limits. (Exhibit E at ¶ 10, pg. 5.)

27. She asked him if he had any injuries from the event, but Wilson did not stay on track and answer her question, instead stating that he would be calling his lawyer due to KDOC refusing to perform a forced cell entry. (Exhibit E at ¶ 11, pg. 5.)

28. Nurse Preedin-Caine documented that Wilson was in a stable condition to remain in his cell, but was told he could follow-up with a sick call if he had any other concerns. (Exhibit E at ¶ 12, pg. 6.)

29. Wilson's medical record shows that his back pain had been present for at least several months. (Exhibit F at ¶¶ 2, 5, pg. 5.)

30. Wilson's medical record show that that his rib pain stemmed from a fight he had been in a month earlier. (Exhibit F at ¶¶ 2, 4, pg. 3.)

31. Wilson's medical record does not connect his back pain or rib pain with the seizure incidents on February 6, 2022. (*See* Exhibit F.)

32. A chest x-ray was performed for Wilson two days after the seizure incidents, which appeared normal, showed no fractures, and showed Wilson's lungs to be clear. (Exhibit E at ¶ 13, pgs. 7-10).

## QUESTIONS PRESENTED

I.      As a matter of law, does the Eleventh Amendment bar Wilson's claims against Defendants in their official capacities for monetary and declaratory relief?

II.     Does Wilson's complaint fail to state a plausible First Amendment retaliation claim when he fails to present evidence that the Defendants' alleged retaliatory motives

were the "but for" cause of the Defendants' actions?

III.   Are Defendants entitled to qualified immunity because their actions – either as alleged or as revealed in the evidentiary record – did not violate clearly established law of which reasonable state officials would have known?

IV.   Should Wilson's claims for punitive damages be dismissed when Wilson cannot show any conduct was motivated by evil intent or was undertaken with reckless or callous indifference to his federal constitutional rights?

## ARGUMENTS AND AUTHORITIES

### *Standard on Motion to Dismiss for Lack of Subject-Matter Jurisdiction*

Under Federal Rule of Civil Procedure 12(b)(1), a defendant may move to dismiss claims for lack of subject-matter jurisdiction. "Federal courts are courts of limited jurisdiction. They possess only that power authorized by Constitution and statute." *Kline v. Biles*, 861 F.3d 1177, 1180 (10th Cir. 2017) (quoting *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). Wilson, as the party invoking the Court's jurisdiction, bears the burden of showing its existence. *Id*. "A court lacking jurisdiction cannot render judgment but must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 906 F.3d 926, 931 (10th Cir. 2018). A federal court must generally "satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).

### *Standard on Motion to Dismiss for Failure to State a Claim*

On a Rule 12(b)(6) motion to dismiss, although a court must accept as true all well-pleaded factual allegations in the complaint, *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009), a complaint must also contain enough facts to state a claim for relief that is plausible on its face. *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

The court need not accept as true those allegations that state only legal conclusions. *Id.* Under this standard, a plaintiff's claim must cross the line from "conceivable to plausible," and "the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007) (emphasis omitted).

Although courts have traditionally construed *pro se* pleadings in a liberal fashion, this "does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based." *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996). Similarly, courts do not assume the role of an advocate for the *pro se* litigant by constructing arguments or searching the record for potentially viable theories. *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005). A *pro se* litigant is expected to construct his or her own arguments or theories and adhere to the same rules of procedure that govern any other litigant in this circuit. *Id.* at 840-41.

### *Summary Judgment Standard*

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018). The court views the evidence and draws all reasonable inferences in a light most favorable to the nonmoving party. *McCoy*, 887 F.3d at 1044. "An issue is 'genuine' if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way," and "[a]n issue of fact is 'material' if under the

substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). When there is no genuine dispute of material fact on an essential element of the nonmovant's claim, then summary judgment is appropriate. *See Sports Unlimited, Inc. v. Lankford Enters.*, 275 F.3d 996, 999 (10th Cir. 2002).

The nonmoving party cannot create a genuine issue of fact by making allegations that are clearly unsupported by the record as a whole. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007). Facts must be identified by reference to affidavits, deposition transcripts, or incorporated exhibits. *Adler*, 144 F.3d at 671. Relying on mere pleadings without supporting facts in the record is not enough. *May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019).

> [T]he mere existence of a scintilla of evidence in support of the nonmovant's position is insufficient to create a genuine issue or dispute of material fact. To create a genuine issue, the nonmovant must present facts upon which a reasonable jury could find in favor of the nonmovant.

*Sinclair Wyo. Refin. Co. v. A & B Builders, Ltd.*, 989 F.3d 747, 765 (10th Cir. 2021) (citation omitted). What is more, "while courts must construe pro se pleadings liberally, pro se plaintiffs may not rely on conclusory allegations to overcome their burden." *Hastings v. Campbell*, 47 F. App'x 559, 560 (10th Cir. 2002) (citing *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991)); *see also McCoy*, 887 F.3d at 1044 ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings.").

### *Qualified Immunity Standard*

Qualified immunity protects from civil liability government officials whose actions do not violate clearly established statutory or constitutional rights of which a reasonable person

would have known.[1] *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). Qualified immunity is an affirmative defense that can be raised in a motion to dismiss or in a motion for summary judgment. *Id.* (citing *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996)). When a § 1983 defendant raises the qualified immunity defense, it creates a presumption that the defendant is immune from suit. *Janny v. Gamez*, 8 F.4th 883, 913 (10th Cir. 2021). To overcome this presumption, the burden shifts to the plaintiff to show (1) the defendant's alleged conduct violated a federal constitutional right, and (2) that right was clearly established at the time of the alleged violation. *Id.*; *see also Grissom v. Roberts*, 902 F.3d 1162, 1167-68 (10th Cir. 2018) ("only if the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant . . . " (comma omitted)). At the motion to dismiss stage, courts look to the defendant's conduct as alleged in the complaint, while at the summary judgment stage, courts look at the defendant's conduct according to the evidence in the light most favorable to the plaintiff. *Thomas*, 765 F.3d at 1194 (citing *Behrens*, 516 U.S. at 309). "The court has discretion to decide which of the two prongs of the qualified-immunity analysis to address first." *Grissom*, 902 F.3d at 1167 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Simply put, qualified immunity "protects all but the plainly incompetent or those who knowingly violate the law." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018). In order to overcome the Defendants' qualified immunity, Wilson must show not only that the Defendants violated his federally secured rights, but also that objectively reasonable officials could not have

---

[1] Federal statutory rights enforceable under § 1983 are limited in number. *See City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 124-25 (2005) ("a few § 1983 claims are based on statutory rights"). They are not relevant to this case (and are generally not relevant to inmate cases), so the rest of this memorandum refers only to "constitutional rights" as shorthand for the full phrase "statutory or constitutional rights."

thought the conduct constitutionally permissible. *Park v. Gaitan*, 680 F. App'x 724, 738 (10th Cir. 2017) (citing *Cortez v. McCauley*, 478 F.3d 1108, 1128 (10th Cir. 2007)); *see also Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (saying the clearly established right must have been "sufficiently clear that every reasonable official would have understood that what he is doing violates that right"); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (saying clearly established case law must answer the "constitutional question beyond debate"). If a plaintiff fails to satisfy either prong of the qualified immunity test, a court must grant the defendant qualified immunity. *Grissom*, 902 F.3d at 1167.

Federal precedent offers two avenues for determining whether challenged conduct violates clearly established constitutional rights: "the plaintiff must show there is a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Colbruno v. Kessler*, 928 F.3d 1155, 1161 (10th Cir. 2019). "[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent." *White v. Pauly*, 580 U.S. 73, 79-80 (2017) (citation omitted). The Supreme Court recently re-emphasized that "the clearly established right must be defined with specificity." *City of Escondido v. Emmons*, 139 S. Ct. 500, 503 (2019). "This Court has repeatedly told courts not to define clearly established law at a high level of generality." *Id*.

## I.   The Eleventh Amendment bars Wilson's § 1983 claims against Defendants in their official capacities.

"The Eleventh Amendment bars suits in federal court against a nonconsenting state brought by the state's own citizens." *Williams v. Utah Dep't of Corr.*, 928 F.3d 1209, 1212 (10th Cir. 2019) (citing *Edelman v. Jordan*, 415 U.S. 651, 662-63 (1974)). "This immunity extends to arms of the state and to state officials who are sued for damages in their official capacity." *Id.* As

such, employees of KDOC share the state's immunity from suits against them in their official capacities. *See White v. Colorado*, 82 F.3d 364, 366 (10th Cir. 1996).

A narrow exception to sovereign immunity allows a plaintiff to seek prospective injunctive relief against a state official for ongoing violations of federal law. *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012) (citing *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002)). But the Eleventh Amendment bars claims for "retrospective declaratory relief" against state officials. *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1232 (10th Cir. 2004). "Once effectively asserted, Eleventh Amendment immunity constitutes a bar to the exercise of federal subject matter jurisdiction." *Williams*, 928 F.3d at 1212.

Here, Wilson requests monetary damages in the form of punitive damages (Doc. 1 at 5), which are barred by the Eleventh Amendment as asserted against Defendants in their official capacities. He does not ask for prospective injunctive relief. Hence, his requested relief is barred by the Eleventh Amendment. Therefore, his claims against Defendants in their official capacities should be dismissed for lack of subject-matter jurisdiction due to Eleventh Amendment immunity.

## II.   Defendants are entitled to dismissal on any First Amendment retaliation claim for failure to establish a retaliatory motive.

In one of the attachments to Wilson's complaint, Wilson vaguely asserts retaliation in a conclusory fashion. As the Tenth Circuit has explained:

> To establish a First Amendment retaliation claim, a plaintiff must show that (1) he was engaged in constitutionally protected activity, (2) the government's actions caused him injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the government's actions were substantially motivated as a response to his constitutionally protected conduct.

*Nielander v. Bd. of Cnty. Comm'rs*, 582 F.3d 1155, 1165 (10th Cir. 2009). "[A]n inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the

prisoner's constitutional rights." *Fogle v. Pierson*, 435 F.3d 1252, 1264 (10th Cir. 2006) (emphasis in original). For example, if a plaintiff fails to present evidence that the defendants' alleged retaliatory motives were the "but for" cause of the defendants' actions, then the plaintiff's allegations of retaliation must fail. *Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998).

Here, Wilson speculates that Defendant Wallace refused him immediate medical treatment out of retaliation for a past PREA complaint that Wilson filed against Wallace in 2019 or 2020. (Doc. 1-1 at 20-21.) But Wilson provides no facts to back this up conclusion. His assertion does not create a genuine issue of material fact regarding retaliatory motives because it is speculative, conclusory, and shows nothing more than Wilson's subjective belief about why the officials acted.[2] *See Lehman v. McKinnon*, No. 20-1312, 2021 WL 4129229, at *2 (10th Cir. 2021) (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)) (summary judgment cannot be defeated "through 'mere speculation, conjecture, or surmise'"); *Nielander*, 582 F.3d at 1165 ("A plaintiff's subjective beliefs about why the government took action, without facts to back up those beliefs, are not sufficient" to establish retaliatory motive); *Guy v. Lampert*, 748 F. App'x 178, 181 (10th Cir. 2018) (mere temporal proximity between inmate's protected activity and alleged adverse action is insufficient). This is insufficient to create a triable issue regarding the third element: whether the government's actions were substantially motivated as a response to constitutionally protected conduct.

Therefore, no triable issue exists regarding that element, and Defendants are entitled to

---

[2] Wilson also did not raise this speculation until the second step of the grievance process, so he has also failed to exhaust administrative remedies with regard to this issue. *See Lindsey v. Cook*, No. 19-3094-HLT, 2021 WL 483855, at *2 (D. Kan. Feb. 4, 2021).

dismissal regarding any First Amendment retaliation claim for failure to state a claim.

III.   **Defendants are entitled to dismissal of Wilson's § 1983 claims for failure to state a claim because qualified immunity applies when the alleged conduct did not violate clearly established law.**

Defendants are entitled to qualified immunity because there was no clearly established law within this Circuit, or a robust consensus of cases outside of it, that their alleged actions violated clearly established law, particularized to the facts of this case. Specifically, Wilson has not shown any law that put Defendants on notice that a forced cell entry is constitutionally required when an inmate in restrictive housing has a seizure, especially when that inmate has a history of weapons possession. Because qualified immunity applies, the Court should dismiss Wilson's § 1983 claims against Defendants in their individual capacities for failure to state a claim.

A.   **The "malicious and sadistic" standard for wantonness applies due to time pressure and competing safety considerations, and Defendants' actions were not malicious or sadistic but were focused on legitimate concerns.**

"After incarceration, only the 'unnecessary and wanton infliction of pain' constitutes cruel and unusual punishment forbidden by the Eighth Amendment." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). "It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause." *Id.* "[W]antonness does not have a fixed meaning but must be determined with due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged." *Wilson v. Seiter*, 501 U.S. 294, 302 (1991).

"[B]ecause the State's responsibility to attend to the medical needs of prisoners does not ordinarily clash with other equally important governmental responsibilities," *Whitley*, 475 U.S. at 320, the Eighth Amendment's prohibition on cruel and unusual punishment "include[s] an

entitlement to a certain minimum standard of medical care while incarcerated." *Clark v. Colbert*, 895 F.3d 1258, 1267 (10th Cir. 2018) (citing *Estelle v. Gamble*, 429 U.S. 97, 101-05 & n.6 (1976)). Under normal circumstances, "[p]rison officials violate the Constitution when they act with 'deliberate indifference to an inmate's serious medical needs.'" *Estate of Beauford v. Mesa Cnty.*, 35 F.4th 1248, 1262 (10th Cir. 2022). "[I]n that context . . . 'deliberate indifference' would constitute wantonness." *Seiter*, 501 U.S. at 302. But "[a]s the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical." *Ellis v. Ogden City*, 589 F.3d 1099, 1102 (10th Cir. 2009) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)).

So in the context of decisions necessarily "made in haste, under pressure, and frequently without the luxury of a second chance," involving "significant risks to the safety of inmates and prison staff," "as reasonably perceived by the responsible officials on the basis of the facts known to them," a higher standard applies. *Whitley*, 475 U.S. at 320-21. Where a prison official's actions are "necessarily taken in haste, under pressure, and balanced against competing institutional concerns for the safety of prison staff or other inmates . . . wantonness consist[s] of acting maliciously and sadistically for the very purpose of causing harm." *Seiter*, 501 U.S. at 302. This "malicious and sadistic" standard applies due to the "time pressure and need to balance competing safety considerations." *DeSpain v. Uphoff*, 264 F.3d 965, 976 (10th Cir. 2001).

Here, Defendants acted under time pressure and with a need to balance a competing institutional concern for the safety of prison staff, so the higher "malicious and sadistic" standard should apply. Wilson only had seizures for limited periods of time. Any decision to make a forced cell entry or not to make a forced cell entry during the seizure incidents or the immediate aftermath would have to be made in haste and under time pressure. And the safety of prison staff

came into play. Wilson refers to a forced cell entry procedure as a "safety precaution." (Doc. 1-1 at 3.) It is common sense that a *forced* cell entry – especially one involving 5 officers using a safety shield to enter and restrain the cell's occupants as Wilson describes (Doc. 1-1 at 3) – uses physical force to mitigate an inherent risk of potential violent resistance. Any safety shields would surely be a "safety precaution" for the safety of staff.

And not only are safety concerns an inherent part of a forced cell entry, but Defendants are permitted to consider Wilson's behavioral history in assessing risks. *See Jordan v. Fed. Bureau of Prisons*, 191 F. App'x 639, 653 (10th Cir. 2006) (prison officials can use behavioral history, including history of weapons possession, to assess the risk associated with an inmate to determine how restricted the inmate's interactions with others should be). Wilson has admitted he did in fact possess the contraband weapons for which he received a disciplinary report. (Doc. 1-1 at 5.) An inmate that has a history of weapons possession and numerous behavioral issues as shown through disciplinary reports (*see* Exhibit A at 5-10) can reasonably be considered to pose a higher risk of causing physical harm to staff. Nothing in the Constitution requires Defendants to have fully believed – or even to have known – Wilson's story about why he had the contraband weapons. Further, due to the nature of their job as officers in a prison setting, Defendants must remain prepared to protect or defend themselves and the security of the institution even when an inmate appears possibly incapacitated or helpless. They are not required to assume that any incapacitation will last or that the inmate will behave when any period of incapacitation ends, however suddenly. They are not even required to fully believe that Wilson was necessarily having a seizure and so drop their guard but may take the possibility that he could be faking for purposes of an ambush into account. Although the Court cannot directly consider a plaintiff's credibility or propensities during a motion to dismiss, the Defendants on the

other hand *were* allowed to reasonably take into consideration at the time the possibility that Wilson may not have been acting completely honestly, especially based on his behavioral history. (*See* Exhibit A at 5-10.)

Because of the time pressure and competing safety considerations, the "malicious and sadistic" standard applies to determine any wantonness of the Defendants' behavior. Wilson has not alleged any facts to support an inference that the Defendants behaved maliciously and sadistically toward him. Rather, from Wilson's Complaint, it is clear that Defendants considered the safety concerns associated with a forced cell entry into the restrictive-housing cell of an inmate with a history of weapons possession. Wilson does not allege any facts to make plausible that the lack of a forced cell entry was motivated by any other concerns. Therefore, no wantonness has been alleged in Defendants' behavior, and Wilson's Eighth Amendment claims should be dismissed for failure to state a claim.

### B. Alternatively, the Defendants' actions did not meet the deliberate indifference standard for wantonness.

Alternatively, even if the lower standard of deliberate indifference applies, Wilson has not met that standard either. Deliberate indifference has both an objective component and a subjective component. *Beauford*, 35 F.4th at 1262 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). For the objective component, the plaintiff must show that the prisoner's medical need was "sufficiently serious." *Id.* (citing *Farmer*, 511 U.S. at 834). "A medical need is sufficiently serious if it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* A showing of substantial harm – which may be satisfied by showing "lifelong handicap, permanent loss, or considerable pain" – also meets the objective component. *Id.* If the allegation is a delay in medical care, then the plaintiff *must* show the delay resulted in "substantial harm."

*Id.* at 1268.

The subjective component requires showing that the prison official had a culpable state of mind. *Id.* at 1262 (citing *Farmer*, 511 U.S. at 834). This is only met if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Even if both the objective and subjective prongs are met, "a constitutionally legitimate justification for denying treatment" may still be shown. *Arocho v. Nafziger*, 367 F. App'x 942, 952 (10th Cir. 2010). This should be determined, not with the benefit of hindsight, but based on what the official reasonably knew at the time. *See Strain v. Regalado*, 977 F.3d 984, 996 (10th Cir. 2020) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)) (saying in the context of the deliberate-indifference standard that "courts do not judge the constitutionality of particular actions 'with the 20/20 vision of hindsight'"). "[P]rison security and *protecting medical staff from potentially dangerous segregation inmates* . . . are legitimate penological goals." *Simpson v. Joseph*, 248 F. App'x 746, 747 (7th Cir. 2007) (emphasis added) (citing *Overton v. Bazzetta*, 539 U.S. 126, 133 (2003) and *Washington v. Harper*, 494 U.S. 210, 225 (1990)). The Supreme Court has described "internal security" as "perhaps the most legitimate of penological goals." *Overton*, 539 U.S. at 133. Prison administrators have an "interest in ensuring the safety of prison staffs and administrative personnel." *Harper*, 494 U.S. at 225.

Here, Wilson fails to allege that a substantial harm was caused to him by a delay in medical treatment. Wilson says his injuries occurred when he fell during the first seizure. (Doc. 1-1 at 2.) He does not allege that staff should have treated him prior to such a fall, but rather complains that staff observed him lying on the ground, after such a fall could no longer be

prevented. (Doc. 1 at 2-3.) He does not allege that he rose from a prone position in between the two seizures, but says he was still lying on the floor. (*See* Doc. 1-1 at 3.) So he does not allege that he fell during the second seizure. Therefore, the substantial harm that Wilson alleges had already occurred when Defendants arrived.

While Wilson alleges that staff observed his second seizure, he does not allege that staff observed his first seizure. (*See* Doc. 1-1 at 2-3.) And Wilson does not allege that the first seizure was of a kind that required emergency medical attention after it had finished. The Court can take judicial notice of the following information on seizures under Federal Rule of Evidence 201, *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007), from the website for the federal government's Centers for Disease Control and Prevention:

<u>Do I call 911?</u>

Seizures do not usually require emergency medical attention. Only call 911 if one or more of these are true:

- **The person has never had a seizure before.**

- **The person has difficulty breathing or waking after the seizure.**

- **The seizure lasts longer than 5 minutes.**

- The person has another seizure soon after the first one.

- **The person is hurt during the seizure.**

- The seizure happens in water.

- The person has a health condition like diabetes, heart disease, or is pregnant.

CDC, Seizure First Aid (last updated Jan. 2, 2022), https://www.cdc.gov/epilepsy/about/first-aid.htm. Wilson does not allege any facts to support that Defendants subjectively knew that any of these criteria were met with regard to the first seizure, so he has failed to allege the subjective

component of the deliberate indifference standard with regard to the period in-between seizures. In accordance with this, the nurse left the scene, apparently not viewing the situation as a medical emergency. (*See* Doc. 1-1 at 2-3.)

When the second seizure occurred, the nurse returned and observed Wilson from outside the cell door (medical observation). (*See* Doc. 1-1 at 3-4.) This time, Wilson was having a second seizure "soon after the first one," which requires emergency medical attention. *See* CDC, Seizure First Aid; (*see also* Doc. 1-1 at 3-4.) Accordingly, the nurse did not leave and she did not cease to provide medical attention through medical observation until Wilson had received medical treatment as well. (*See* Doc. 1-1 at 4, 19-20.)

What is more, Defendants had "a constitutionally legitimate justification for denying treatment" until Wilson could come to the door to be restrained. Although Wilson alleges a violation of an alleged policy regarding forced cell entry, "a defendant's violation of a prison policy does not a constitutional violation make." *Williams v. Miller*, 696 F. App'x 862, 869 & n.14 (10th Cir. 2017) (citing *Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993)). As argued above with regard to the "malicious and sadistic" standard, even from Wilson's Complaint, it is clear that Defendants considered the safety concerns associated with a forced cell entry by staff into the restrictive-housing cell of an inmate with a history of weapons possession. The Court can take judicial notice that the American Red Cross's first recommended step for First Aid includes to "CHECK the scene for safety [and] form an initial impression." American Red Cross, First Aid Steps (emphasis in original), https://www.redcross.org/take-a-class/first-aid/performing-first-aid/first-aid-steps (last accessed June 6, 2023). Ensuring the safety of the scene is important even outside a prison setting, so it is certainly permissible to ensure the safety of a scene in a prison setting as well. If the nurse's continual medical

observation had indicated that Wilson's condition worsened at any point, then the Defendants could have re-evaluated whether to conduct a forced cell entry despite the competing safety concerns.

Accordingly, no clearly established law would have put Defendants on notice that their alleged actions were unlawful under these circumstances. Looking only to the conduct as alleged in the complaint, Defendants are entitled to qualified immunity as a matter of law. Wilson's claims should be dismissed for failure to state a claim.

## IV.   Alternatively, Defendants are entitled to summary judgment on Wilson's § 1983 claims because the record further supports qualified immunity.

Even more reasons exist to find qualified immunity on summary judgment. Wilson was in restrictive housing in the first place because of his possession of two improvised stabbing devices, considered along with his recent disciplinary report history and "his overall mal-adapted behavior." (Exhibit B at ¶¶ 7-8, pg. 4.) He was in restrictive housing on "Other Security Risk" (OSR) for the safety and security of the facility. (Exhibit B at ¶¶ 6-7, pg. 4; *see also* Exhibit D at 4, 10-11, 16-17 (policy explaining "Other Security Risk"); Exhibit B at ¶¶ 4-5 (practice).) And prior to the seizure events taking place, Wilson had recently been angry with officers in the cell house and became argumentative. (Exhibit E at 4.) Defendants could reasonably take into account this information about Wilson being a heightened security risk due to past weapons possession and his recent angry, argumentative behavior toward staff when evaluating the risk he may pose to staff.

The Unit Team Manager at EDCF attests that forced cell entry, which by its very nature involves the use of force toward inmates and involves a risk of harm and even a risk of death of facility staff, is not generally authorized to facilitate treatment of medical issues. (Exhibit B at ¶¶ 9-11.) Rather, forced cell entry is only authorized when, in the opinion of the appropriate

facility staff, in light of the use of force policy outlined in KDOC's Internal Management Policy & Procedure (IMPP) 12-111A and the context of the situation, the justification is sufficient to justify the use of force against inmates and to outweigh the risk to facility staff. (Exhibit B at ¶ 12.) And an inmate's past history of weapons possession increases the risk of harm to facility staff. (Exhibit B at ¶ 13.) Wilson does not allege facts that would meet the criteria specified in IMPP 12-111A(IV)(J)(1). (Exhibit G at 7 (policy); *see also* Exhibit B at ¶ 4 (practice).) Defendants could reasonably consider when evaluating the risk to the safety of staff: the risks of forced cell entry; the prison's policies not authorizing the use of force; that forced cell entry was not generally authorized to facilitate treatment of medical issues; and that Wilson was a heightened security risk due to past weapons possession.

Wilson alleges that "segregation security measures" say that a forced cell entry is required (Doc. 1-1 at 3), but Wilson does not provide the name or identification number for the alleged policy, and Defendants are unable to identify any policies that appear similar to what Wilson alleges. Nothing in KDOC's IMPP 10-122D regarding "Access to and Availability of Health Care Services" requires anything similar to what Wilson alleges, even the sections on Restrictive Housing (Exhibit C at 5-6 (policy)) and Emergency Care Services (Exhibit C at 8-9 (policy)). *See also* Exhibit B at ¶ 4 (practice). This further supports that forced cell entry is not generally authorized to facilitate treatment of medical issues.

Medical documentation from the event confirms that nurse Preedin-Caine medically observed Wilson from outside Wilson's cell door. (Exhibit E at ¶¶ 4, 8.) Wilson's respirations appeared even and unlabored at a rate of 18 breaths per minute. (Exhibit E at ¶¶ 4, 8.) 15. Nurse Preedin-Caine observed Wilson moving his shoulders and neck. (Exhibit E at 5.) No observations of choking were noted. (*See* Exhibit E at 1-6.) No blood, vomit, or urine was noted.

(*See* Exhibit E at 1-6.) No worsening symptoms or developing complications were noted. (*See* Exhibit E at 1-6.) These observations support the reasonableness of Defendants only permitting medical observation until Wilson was able to make it to the cell door to be restrained for medical treatment.

Before the nurse left in between the seizures, Wilson was advised that a sick call would be placed for him for follow up since he could not be further assessed at that time. (Exhibit E at ¶ 7.) As discussed above, Wilson has not alleged facts supporting that the Defendants subjectively knew criteria were met that the aftermath of the first seizure constituted a medical emergency. *See* CDC, Seizure First Aid. Additionally, nothing in the medical note by the nurse indicates she or Defendants observed that any such criteria was met. (*See* Exhibit E at 1-6.) Although Wilson's cellmate speculated that Wilson "may have hit his head," no clear signs of injury were communicated or observed. (*See* Exhibit E at 5.) The note does not mention blood, vomit, or urine. (*See* Exhibit E at 1-6.) Although some evidence exists regarding "blood and mucus" on Wilson's T-shirt (Doc. 1-1 at 11), no evidence supports that the blood came from any visibly apparent injuries sustained. Rather, the only source of blood or mucus in the medical record is when Wilson reported at a medical visit the next day that he was coughing up "spots" of blood in his sputum, although no coughing was observed during the visit. (Exhibit F at ¶ 6.) Placing a sick call for follow-up after the first seizure was appropriate in light of what the record shows about the subjective knowledge of the responding staff.

Later, after the second seizure, the nurse documented that Wilson "rises slowly and comes to the food pass with his hands behind his back." (Exhibit E at 5; *see also id.* at ¶ 9.) She assessed him in his cell and documented that he was alert and oriented. (Exhibit E at ¶ 10.) She further documented that his pupils were equal, round, and reactive to light and that his vital signs

were within normal limits. (Exhibit E at ¶ 10.) She asked him if he had any injuries from the event, but Wilson did not stay on track and answer her question, instead stating that he would be calling his lawyer due to KDOC refusing to perform a forced cell entry. (Exhibit E at ¶ 11.) So even at that point, Wilson did not communicate any of his alleged injuries to staff. This further supports that the Defendants did not subjectively know that any injuries had been sustained. The nurse documented that Wilson was in a stable condition to remain in his cell, but was told he could follow-up with a sick call if he had any other concerns. (Exhibit E at ¶ 12.) So the nurse did not cease medical observation and treatment until she was convinced that Wilson was in a stable condition.

Wilson's complaint requests punitive damages due to back pain. (Doc. 1 at 5.) But Wilson's medical record does not show any substantial harm to Wilson's back from a delay in medical treatment. It instead shows that his back pain had been present for at least several months. (Exhibit F at ¶¶ 2, 5.) It further shows that his rib pain stemmed from a fight he had been in a month earlier. (Exhibit F at ¶¶ 2, 4.) Wilson's medical record does not connect his back pain or rib pain with the seizures on February 6, 2022. (*See* Exhibit F.) A chest x-ray was performed two days after the seizure incidents, and the x-ray appeared normal, showed his bony thorax (which includes the ribs[3]) to be intact, and showed his lungs to be clear. (Exhibit E at ¶ 13, pgs. 7-10.) It was negative for rib fractures. (Exhibit E at 9-10.) This supports the lack of a substantial harm.

Therefore, the evidentiary record further supports that Defendants are entitled to qualified

---

[3] Bony Thorax, The Oxford Dictionary of Sports Science & Medicine (3d ed. 2007), https://www.oxfordreference.com/display/10.1093/acref/9780198568506.001.0001/acref-9780198568506-e-988?rskey=vQdPR4&result=988 ("Bones that form the framework of the thorax (ribs, sternum, and thoracic vertebrae).").

immunity under either of the standards for wantonness discussed in the previous section.

**V.** **Wilson is not entitled to punitive damages when he cannot show any conduct was motivated by evil intent or was undertaken with reckless or callous indifference to his constitutional rights.**

Even if Wilson states a claim that survives summary judgment, Wilson is not entitled to punitive damages against Defendants for want of the requisite subjective intent. A § 1983 plaintiff claiming punitive damages must prove defendants' conduct either "is shown to be motivated by evil motive or intent" or "involves reckless or callous indifference to" his federal constitutional rights. *Searles v. Van Bebber,* 251 F.3d 869, 879 (10th Cir. 2001) (quoting *Smith v. Wade,* 461 U.S. 30, 56 (1983)). Barring pleading and proof that a defendant "either acted with malice or knew [his] actions were unconstitutional," a § 1983 plaintiff cannot pursue a claim for punitive damages. *See Jolivet v. Deland*, 966 F.2d 573, 577 (10th Cir. 1992). Wilson has not alleged or provided any evidence that any of the Defendants acted with the required maliciousness, evil motive, or with reckless indifference to Wilson's civil rights, or that they subjectively knew their actions were unconstitutional under clearly established law. As a matter of law, Wilson cannot receive punitive damages. Therefore, even if Wilson states a claim that survives summary judgment, the Court should dismiss his claims for punitive damages or grant partial summary judgment[4] to Defendants on those claims.

**VI.** **The Court should decline to exercise supplemental jurisdiction over the state law negligence claims given the absence of a sufficient federal claim.**

"When all federal claims have been dismissed, the court may, and usually should, decline to exercise jurisdiction over any remaining state claims." *Koch v. City of Del City*, 660 F.3d

---

[4] Rule 56 of the Federal Rules of Civil Procedure allows for "partial summary judgment," not necessarily on whole claims, but on a "part of each claim or defense."

1228, 1248 (10th Cir.2011). Here, all federal claims should be dismissed for the reasons outlined above, and the Court should decline to exercise jurisdiction over any remaining state claims.

## CONCLUSION

Defendants request that the Court dismiss Wilson's § 1983 claims against Defendants in their official capacity due to Eleventh Amendment immunity. Defendants request that the Court dismiss Wilson's § 1983 claims against Defendants in their individual capacity due to lack of retaliatory motive (for any First Amendment retaliation claims) and due to qualified immunity. No clearly established law shows Defendants' conduct to be wanton under either the "malicious and sadistic" standard or the "deliberate indifference" standard. Alternatively, Defendants request that the Court grant summary judgment on the § 1983 claims because the evidentiary record further supports qualified immunity. Alternatively, if Wilson states a § 1983 claim that survives summary judgment, Defendants request that the Court dismiss or grant partial summary judgment on Wilson's claims for punitive damages due to lack of the requisite subjective intent. If Wilson's § 1983 claims are dismissed or the Court grants summary judgment to Defendants on those claims, then the Court should decline to exercise supplemental jurisdiction over the remaining state law claims.

Respectfully submitted,

OFFICE OF ATTORNEY GENERAL
KRIS W. KOBACH

*/s/ Matthew L. Shoger*
Matthew L. Shoger, KS No. 28151
Assistant Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612-1597
matt.shoger@ag.ks.gov
(785) 296-2215
Fax: (785) 291-3767
*Attorney for the Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 6th day of June, 2023, the foregoing document was filed with the clerk of the court by using the CM/ECF system, which will send notice of electronic filing to all registered parties and interested parties. I also certify that a copy of the above will be mailed by means of first-class mail on the 7th day of June, 2023, postage prepaid, addressed to:

> Thomas L. Wilson #70525
> El Dorado Correctional Facility-Central
> P.O. Box 311
> El Dorado, KS 67042
> *Plaintiff, pro se*

*/s/ Matthew L. Shoger*
Matthew L. Shoger
Assistant Attorney General